SCOTT, CHARLES R., Associate Judge.
The appellant, J. C. Benefield, was charged with the crime of grand larceny on a direct information filed by the State Attorney of Pinellas County and was subsequently convicted by a trial jury of the crime of an attempt to commit grand larceny after the Court had previously directed a verdict of acquittal on the charge of grand larceny upon the conclusion of the state’s case.
Motion for new trial was denied and appellant was adjudged guilty and sentenced to serve an indeterminate term of six months to two and a half years in State Prison. Nine questions have been assigned for argument on this appeal and the first question to be considered is whether or not the verdict is contrary to the law and the evidence.
The information charged that appellant, J. C. Benefield, did feloniously steal, take and can-y away the sum of Three Thousand Dollars ($3,000.00) from Maurice A. Rosen-thal on April 27, 1961, in Pinellas County, Florida. A bill of particulars furnished by the state “averred that the manner in which the said larceny occurred is that the defendant, J. C. Benefield held out and represented to Maurice A. Rosenthal and one Robert A. Hollander that he, the said J. C. Bene-field, in consideration of them paying he, the said J. C. Benefield, the sum of five thousand dollars, he, the said J. C. Benefield was capable of and could and would secure for said Maurice Rosenthal, a State of Florida Beverage License theretofore applied for by the said Maurice Rosenthal when in fact and truth, the said J. C. Benefield was without authority or ability to procure said beverage license, which fact was well known to him; that the representation of the said J. C. Benefield as to his ability to procure said beverage license was false and constituted a false or fraudulent representation relied upon by the said Maurice Rosenthal”. * * * “that said false representations occurred in the City of St. Petersburg, at 1101 — 62nd Avenue South on the 25th day of April, 1961; at the office of the defendant, J. C. Benefield in the City of St. Peters-burg on the 26th day of April, 1961 and on the 27th day of April, 1961 at the home of J. C. Benefield in the City of St. Petersburg, Florida”. * * * “that the taking of money as alleged in the Information was taken by the said J. C. Benefield with intent to deprive or defraud the true owner thereof of same”.
By reason of the population increase shown by the 1960 Federal census, Pinellas County was entitled to fourteen additional liquor licenses, which were to be issued by the Beverage Department of the State of Florida. The appellant, J. C. Benefield, was a practicing chiropractor in St. Petersburg and had been appointed by the Governor as a member of Governor Bryant’s unofficial Advisory Committee in Pinellas County.
On April 21, 1961, Robert Hollander testified he was approached at his place of business by appellant, J. C. Benefield, who represented himself as a St. Petersburg lawyer and said he was calling about the application for a liquor license for Skyway Bowl, which was a bowling alley in St. Petersburg owned by a corporation of which Hollander was a stockholder. Hollander testified appellant represented himself to be a member of the Governor’s Patronage Committee and offered at that time and place to help him get a liquor license for five thousand dollars in cash, to be payable in small bills.
Maurice Rosenthal, an officer of Skyway Bowl, testified the appellant came to the Skyway Bowl on April 25, 1961, and identified himself as J. C. Benefield and said he was on the Governor’s Patronage Committee and if we wanted a liquor license he could not guarantee it but could practically assure it and if the license was not obtained our money would be returned. Rosenthal *653 also testified that appellant stated that the mone5 had to be in Tallahassee the next day and that he had been ordered to pick the money up by people higher up.
Hollander testified on April 26th he and his uncle, Maurice Rosenthal, went to the office of Dr. Benefield and by that time he knew he was a doctor and not a lawyer. He further testified that their visit to the office was for the purpose of making preparations for the payment of the money. Arrangements were then made for Hollander and Rosenthal to bring three thousand dollars to Dr. Benefield’s office the next morning, April 27th, at 10:30 o’clock, and the balance of two thousand dollars was to be paid to Benefield as soon as Hollander’s father returned from Colorado. According to Hollander, it was agreed by Benefield that should the liquor license not be issued for any reason at all the money would be returned.
The next morning, April 27th, Hollander and Rosenthal went to Dr. Benefield’s office after obtaining the money from their attorney, Herman Goldner, and after notifying the St. Petersburg Times and the St. Petersburg Police Department. Dr. Bene-field was not at his office but was sick at home and Hollander and Rosenthal then proceeded to his home in St. Petersburg with two city detectives who waited outside. Upon the detectives being advised by Rosen-thal and Hollander that the three thousand •dollars had been paid to Dr. Benefield they entered his home without a warrant for his arrest and without a search warrant and found the money in his bedroom.
Thomas E. Lee, Jr., testified on behalf of the state that he was Director of the State Beverage Department and that his duties included the issuance of new quota liquor licenses based on the increase in population. Mr. Lee also testified that he had the sole discretion as to the issuances of the new quota liquor licenses and would have given some weight to a recommendation by Dr. Benefield if it had been received, as well as weight to a recommendation from any other citizen of Pinellas County.
The appellant did not testify but two of the committee members in testifying for the defense stated that a meeting of the eight man committee was to be held on the evening of April 27, 1961, at which time the applicants for liquor licenses would be considered as there were more applicants than licenses available. One of these two committee members, John A. Hanley, a St. Petersburg attorney and former FBI agent, also testified that Dr. Benefield was a member of this committee in April, 1961, and that the committee met quite frequently and at least once a month. Mr. Hanley stated there had been a meeting of the committee on March 23, 1961, at which time Dr. Bene-field was present and at the conclusion of the meeting there had been a discussion as to who was going to handle the distribution of new liquor licenses in Pinellas County. Mr. Hanley also testified that Dr. Benefield had been the work horse of the committee and “we just presumed he would try to locate the applicants and if it was presented to us we would at a subsequent meeting make any recommendations that the Governor’s office desired”.
Robert A. Hollander testified that the following conversation occurred in the bedroom of Dr. Benefield’s home at the time the money was passed to him by Maurice A. Rosenthal:
“Q What did he say to you then ?
“A Substantially, ‘Good morning, glad to see you could make it’, and sorry he was not at the office, that he was not feeling well today.
“Q And then the money was handed to Dr. Benefield?
“A Not immediately. As I say my uncle was expressing some concern to him about handing over such a large amount of money to someone he had known such a short time and no guarantee of getting the money back other than the gentleman’s word.
*654 “Q There was no guarantee of getting a license, was there?
“A No, just the assurance.
“Q The assurance he would exert his influence in your behalf to get the license ?
“A At the house he did not guarantee it but he said he could not see any trouble, he could almost guarantee it.
“Q T can’t guarantee it but I can’t see any trouble and I can almost guarantee it’.
“A Yes.
“Q And again if he could not get the license the money would be returned to you ?
“A Yes. * * *”
“Q How was the money given to Dr. Benefield, how did he come into possession of it, if he did?
"A Well, after we had received more like I explained assurances of the safety of the money and the good chance we would now have of having the license, when we got up to leave my uncle gave him a stack of bills.”
Hollander testified that on his first meeting with appellant he was told by appellant what would have to be done to get a liquor license for Skyway Bowl.
"Q Now, again he told you what he would have to do and what you would have to do, he would have to make a recommendation and you would have to pay him some money?
“A No, not that he would have to make a recommendation. You have it wrong. He was not trying to tell me I don’t think that he was powerful enough to go up and get us a license. Only that he had represented and had known some people in Tallahassee and in the State Beverage Commission and the State Legislature that could get a license.
“Q And he would intercede with these people in your behalf for some money?
“A Right. * * *”
“Q Did you believe him on the 21st?
“A No, although I must say I was impressed. Let’s say I believed him and I did not believe him. There was certain things I did believe, especially I would say I did think he had some influence in Tallahassee as far as having influence, yes, but as far as that being a pre-requisite for a license that I did not believe. I did believe he could do it, I mean, of course I did not know him that one day but knowing the names he mentioned as far as Committees and so forth I certainly was impressed.
“Q But you did not believe him when you went on the 26th ?
“A What do you mean by believing him?
“Q Exactly what I said.
“A Believe he could get the license for me?
“Q Yes.
“A Yes, I did believe it.
“Q What is it you did not believe?
“A I did not believe we should have to pay five thousand dollars to get a license that was supposed to come from the State Capital.
“Q Did he guarantee he would get you a license or that he would intercede for you?
“A He guaranteed he would do his best to get us a license through the people he knew in Tallahassee.
“Q Through the proper authorities?
“A That is right.
“Q And he would do his best to get you a license through the proper authorities?
“A That is right.
“Q He told you if he was unsuccessful your money would be returned to you?
*655 “A Yes, sir.
“Q What names if any did he mention?
"A People?
“Q Yes, people.
“A No people. Just Committees and so forth like the Governor’s Patronage Committee and the Highway Commission and the Liquor Beverage Commission.
“Q Did he say the Governor’s Patronage Committee or Governor’s Advisory Committee ?
“A Patronage Committee. I don’t even know what it is.
“Q He could have been telling the truth about that, couldn’t he ?
“A Probably so.”
Maurice Rosenthal testified as to his first meeting with appellant on April 25th at the Skyway Bowl as follows:
“Q How did he identify himself?
“A. He said, ‘Well, I am the man that spoke to your nephew Friday night regarding the liquor license’.
“Q Did he tell you who he was ?
“A Not at that time, no sir.
“Q Go ahead.
“A I asked him to come into a small office we have right off the corridor there. Pull up a chair, and we sat down. And he asked me if we were prepared to go along with the deal.
“Q What deal?
“A The obtaining of a liquor license. I told him I understood the price was five thousand dollars and I thought it was a lot of money. I also told him at that time I did not know him and it was not very reasonable to give a man you did not know five thousand dollars that might wind up in South America or some place. He then identified himself by giving me a business card showing the driver’s license and various other cards that’ all had J. C. Benefield on them. He told me at that time that he was on the Governor’s Patronage Committee, that he was very active in civic affairs and had been for a number of years. That he had been notified from Tallahassee to contact Jules and Robert Hollander on the Q. T. to get this matter cleared up.
“THE COURT: Say that again?
“A That he had been notified from Tallahassee to contact Jules and Robert Hollander to get this thing straight and on the road, that is the obtaining the liquor license. That the price was five thousand dollars and the bills not larger than a twenty. I told him at that time I had not been able to contact my brother-in-law and I did not have five thousand dollars at that time. Dr. Benefield told me the following day Wednesday would be the deadline, that I was to bring five thousand dollars to his office.
“THE COURT: Is that all?
“A That is approximately what took place that afternoon.
“Q Did Dr. Benefield tell you what the five thousand dollars was for?
“A He told me that was the price that would have to be paid in order to obtain the liquor license over and above the actual fee charged by the State.
“Q Were you given any assurance the payment of the five thousand dollars would get your liquor license?
“A Dr. Benefield assured me that getting the liquor license, that everything was ready to go and the money had to be turned in before it could be approved, or would be approved.
“Q Was that about all that transpired on that particular occasion ?
“A That is about the sum and substance of it.
*656 “Q Did you see Dr. Benefield the next day, the 26th of April?
“A Yes, I did.
“Q Where did you see him?
“A At his office.
“Q How come you to go to his office and see him on that occasion?
“A We were supposed to go the following day with money for the pay-off.
“Q You have not told us about any arrangements you were to be there the following day?
“A He told us the following day was the deadline, the money had to be in there that day.
“Q You went to his office the next day the 26th?
“A I went to his office the- next day, the 26th with my nephew. When we arrived at the office Dr. Benefield was not in. However we had not been there over thirty seconds when he came in the back way and greeted us and ushered us into the inner office.
“Q Who all was in there when you got in the inner office?
“A My nephew, Dr. Benefield and myself.
“Q You are speaking of Robert Hollander?
“A Yes.
"Q Tell what transpired in there on that occasion, what was said and what transpired ?
“A I told Dr. Benefield at that time I had not been able to raise five thousand dollars, that our bank balance at that time with the checks we had out amounted to about thirty-three hundred dollars. It was near the end of the month and the rent was coming due and it would be a difficult thing to raise five thousand dollars until my partner got back. Dr. Benefield asked me could I get the three thousand dollars and I told him I thought I could. He said, ‘You get the three thousand dollars and I will call Tallahassee and tell them you are going along with the deal and you can bring the two thousand dollars in as soon as your brother-in-law gets back’. At that time I asked him if we could not get by with just the three thousand dollars and he said, ‘No, you have to bring the other two to complete the transaction’, and in the event that I did not that the beverage people would be very, very hard to live with. * * * ”
“Q All right. Did anything else happen on that occasion?
“A He said that he would call somebody up the line and they were going to open the office tomorrow morning at nine o’clock I believe and advise them everything would be all right and I could come in tomorrow morning and pay off not later than ten-thirty.
“Q Tomorrow morning, do you mean the 27th?
“A The following morning. He was going to hold off that long. I told him I would have to go to the bank and make arrangements for the money and we might be a few minutes late and I think we came up between ten-thirty and ten-forty-five.”
Maurice Rosenthal gave the following testimony with reference to his conversation with Dr. Benefield in the bedroom of his home on April 27th at the time the money was delivered:
“Q Where did you go when you entered the house?
“A She (meaning Mrs. Benefield) told us to go on back to the bedroom. Dr. Bene-field was lying in bed and he greeted us very cordially, of course, and we started the conversation about the liquor license and the money and of course—
“Q Will you tell the jury what was said, what you said and what Dr. Bene-field said on that occasion?
*657 “A I told Dr. Benefield I was a little nervous about turning over such a large amount of money to him. That my brother-in-law was not in the City and not aware of the transaction as it was going on. He said I need not worry about it, that everything was fine. That it would come back to us at a big profit. He said if we wanted to dispose of the license he could get us nine or ten thousand dollars for it the next day. Of course we had to hold on to it ninety days but he had a bar ready and waiting. I gave him the money and asked him if he wanted to count it and he said it was not necessary but I believe he did go through one pack of fifty dollar bills. * * *”
“Q Was anything else said on that occasion?
“A He assured us we had nothing to worry about unless of course we did not come up with the two thousand dollars.
“Q What is that?
“A He said we had nothing else to worry about excepting of course if we did not raise the other two thousand dollars which he expected on my partner’s return and in case that did not take place we would be in hot water.
“Q If you did not raise it what would happen ?
“A He told us we would find the Beverage people and the people we were doing business with hard to live with. * * * ”
“Q Did you believe Dr. Benefield’s assurance he could obtain this license if you gave him the five thousand dollars?
“A I thought possibly he could have if he was in with the kind of people he claimed to be in with. He might have. * * * ”
“Q Answer me this. Were you at any time misled by anything Dr. Benefield said to you?
“A How do you mean misled?
“Q You knew or you believed he was lying to you, didn’t you?
“A I had no way of knowing he was lying or was not lying.
“Q You believed he was lying, didn’t you?
“A I told Herman Goldner the proposition that had been made, that my brother-in-law was out of town and I asked him for his legal advice. And he told me—
“Q I don’t want you to tell me what he told you. But answer my question did you believe Dr. Benefield could do what he said he could do?
“A I had no way of knowing.
“Q Did you believe it?
“A If I had believed it and thought it was that price I would not have gone to the police with it.
“Q If you had believed it you would not have gone to the police with it?
“A No.
“Q What did he tell you on the 25th, the day of his first visit to you, Mr. Rosen-thal?
“A He told me he was the man that had contacted or spoken to my nephew the preceding Friday night about the liquor license.
“Q Go ahead, sir.
“A And it went on the same way. I took him into the office and we sat down and he went over the same story. I asked him what assurance I had we could get a liquor license and that is when he told me his connections with civic affairs and was on the Governor’s Patronage Committee. That the money had to be in Tallahassee the following day if we wanted to get a liquor license.
“Q He did not guarantee you could get a license, did he?
“A He assured me he could
*658 “Q Didn’t he say, ‘I cannot guarantee this hut I can practically do it’?
“A He said it is practically sure.
“Q Then he told you also, did he not, if he failed your money would be returned to you?
“A He did that.
“Q He most certainly did, didn’t he?
"A Yes, sir.
“Q Why didn’t you testify to that portion of your conversation on direct examination ?
“A I was not asked.
“Q You were asked to tell the whole truth and repeat the whole conversation.
“A Well, that slipped my mind. He told me the money would be right in St. Petersburg if we wanted it.
“Q And he told you it would be returned to you if you did not get the license ?
“A That is right.
“Q What did he tell you on April 26 at his office?
“A The same things in substance.
“Q Again he would not guarantee it but he could practically assure it?
“A He was pretty positive about it.
“Q What was he going to do in exchange for the money?
“A He was going to see that we got a liquor license.
“Q He was going to intervene or use influence in your behalf?
“A No, he was not only going to use his influence. He told me he had been ordered to pick the money up by people higher up. His influence was not mentioned to me.
“Q His influence was not mentioned to you or in your presence?
“A That is right.
“Q Robert Hollander was there with you in Dr. Benefield’s office on the 26th?
“A Yes, sir.
“Q It was not mentioned he would exercise his influence in your behalf?
“A He told me he had friends up there and was ordered to see Jules and Robert Hollander on the Q. T. * * * ”
“BY THE COURT
“Q Was it a loan or just money to use, Mr. Goldner’s money for the purpose of entrapment ?
“A It was a loan. I told him I could not raise that money at that time and he told me—
“Q Furnish some money for the purpose of entrapment or for the purpose of getting the license?
“A It was for the purpose of paying Dr. Benefield.
“Q For entrapment. It was a scheme to entrap him if you thought he was doing that and that is what it was for?
“A I would say so.
“Q Using Mr. Goldner’s money?
“A I would say so.
“Q And if it did not go through Mr. Goldner would get his money back, wasn’t that it?
“A Absolutely.”
Before its repeal in 1951, the crime of obtaining property by false pretenses was contained in Section 817.01 of the Florida Statutes, F.S.A. and read in part as follows :
“Whoever designedly by a false pretense, or by a privy or false token, and with intent to defraud, obtains from another person any property, or obtains with such intent the signature of any person to a written instrument, the false making whereof would be *659 punishable as forgery, shall be punished by imprisonment in the state prison not exceeding ten years, or by fine not exceeding five hundred dollars.”
The Supreme Court of Florida in Anglin v. Mayo, 88 So.2d 918, in referring to the repeal of Section 817.01, and its inclusion in the comprehensive revision of the offense of larceny contained in paragraph (1) (a) of Section 811.021, Florida Statutes, F.S.A., says:
“This Act was in the books for many years prior to 1951. Our own examination of the record, however, suggested a consideration of the effect of the passage of Chapter 26912, Laws of Florida, 1951, now cited as Section 811.021, Florida Statutes, F.S.A., upon the pre-existing Statute which we continue to cite as Section 817.01, Florida Statutes, F.S.A., and which continues to be included in the biennial revision of the Florida Statutes through 1955. Chapter 26912, Laws of Florida, 1951, Section 811.021, Florida Statutes, F.S. A., reads in part as follows:
‘“(1) A person who, with intent to deprive or defraud the true owner of his property or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person:
“ ‘(a) Takes from the possession of the true owner, or of any other person; or obtains from such person possession by color or aid of fraudulent or false representations or pretense, or of any false token or writing; or obtains the signature of any person to a written instrument, the false making whereof would be punishable as forgery; or secretes, withholds, or appropriates to his own use, or that of any person other than the true owner, any money, personal property, goods and chattels, thing in action, evidence of debt, contract, or property, or article of value of any kind; * * *
* * * * * *
“ ‘(3) If the value of the property stolen as mentioned in the preceding section is less than fifty dollars the offender shall be deemed guilty of petit larceny and upon conviction, shall be punished by imprisonment in the county jail not exceeding six months or by fine not exceeding three hundred dollars.’
“It is perfectly clear that Chapter 26912, supra, was a legislative revision of the laws condemning the offense of larceny by redefining various offenses theretofore defined by certain sections of our Statutes. It is also clear that the offense condemned by paragraph (1) (a) of Section 811.021, Florida Statutes, F.S.A., is a comprehensive revision of the offense previously condemned by Section 817.01, Florida Statutes, F.S.A., as well as other pre-. existing Statutes. In other words, insofar as Section 817.01, Florida Statutes, F.S.A., is concerned, Section 811-021, Florida Statutes, F.S.A., a later Act, defines and comprehends the same offense.” (Emphasis supplied)
The elements of the crime of obtaining property by false pretenses remain the same under paragraph (1) (a) of Section 811.021. The Supreme Court of Florida in Ex parte Stirrup, 155 Fla. 173, 19 So.2d 712, in stating these elements said:
“To constitute the criminal offense denounced by the statute, there must be a representation of a past or existing fact or circumstance by the defendant to another for the purpose of obtaining'property from the latter; the representation must be false in fact; it must have been made with knowledge of its falsity; it must have been made with intent to deceive the other party; it must have been believed by the other party; he must have parted with his property to the defendant because of it. *660 Clifton v. State, 76 Fla. 244, 79 So. 707; State ex rel. Warren v. Sweat, 135 Fla. 661, 185 So. 453; Finlay v. State, 152 Fla. 396, 12 So.2d 112.
“It is also necessary that a false statement or representation of an existing fact or circumstance by one person to another for the purpose of obtaining property from the latter be of such nature or character that if the fact was as represented it would place upon the latter a duty, obligation or desire to part with the property demanded. Inasmuch as deception is the essence of the crime, there must be a causal relation between the representation or statement made and the delivery of the property.”
The distinction between the old and new statutes and the reasons therefor are well stated in Volume 14, Florida Jurisprudence, False Pretenses and Cheats, Section 3, reading as follows:
' “Sec. 3. Distinctions.
“The former crime of false pretenses was distinguishable from the offense of larceny in the form in which the latter ordinarily occurred. Larceny was essentially a crime committed against possession and involved a trespass, whereas false pretenses was a crime which necessarily involved obtaining title through the perpetration of a fraud. It was important to maintain this distinction, since the maximum penalty for the crime of false pretenses was greater than that for larceny. It would appear, however, that this distinction is no longer of any significance, since it was to eliminate the problems of prosecution that frequently arose as a result of distinguishing between the two crimes that a revised and comprehensive definition of larceny was enacted by the legislature, which, as has been stated above, incorporated within its terms the offense which theretofore constituted the separate crime of false pretenses.”
The trial judge in directing the verdict of acquittal on the charge of grand larceny at the close of the state’s case told the jury:
“Gentlemen, I am going to instruct you at this time that the evidence presented in this case completely fails to shozv one indispensable element of larceny by the avenue of false pretense, and that is that the representations were believed to be true and acted upon by the person to whom they were made under the belief that these representations were true. Now, in this case the evidence completely fails, in fact it negates the element that his statements were believed to be true by Mr. Rosen-thal or Mr. Hollander or anyone else connected with this case to be true at the time the money is alleged to have been delivered to Dr. Benefield. So the evidence is completely lacking in a completed act of larceny.” (Emphasis supplied)
In 89 A.L.R. 342, there is an annotation on “Failure to deceive prosecutor, or fact that prosecutor did not rely on pretenses, as affecting charge of offense of attempting to obtain property by false pretenses.”
“While it may be said to be the general rule that the completed crime of obtaining money or property under false pretenses cannot be established unless it appears that the person alleged to have been defrauded believed the false pretense to be true, and was deceived (see 11 R.C.L. p. 835), a distinction is drawn in this respect between the completed crime and the attempt to commit it; it being held that the offense of attempting to obtain money or property under false pretenses may be committed although the prosecuting witness knew that the pretenses were false, or irrespective of whether they were true or false, did not rely on them. State v. Phillips (1907) 36 Mont. 112, 92 Pac. 299; People v. Spolasco (1900) 33 Misc. 22, *661 ■67 N.Y.Supp. 1114; Com. v. Johnson (Pa.) (reported herewith) ante, 333; State v. Peterson (1919) 109 Wash. 25, 186 Pac. 264, 8 A.L.R. 652; Reg. v. Ball (1842) Car. & M. 249, 174 Eng. Reprint, 493; Reg. v. Hensler (1870) 11 Cox.C.C. (Eng.) 570; Rex v. Light (1915) 84 L.J.K.B.N.S. (Eng.) 865, 11 Cr.App.Rep. 111—C.C.A. See Reg. v. Roebuck (1856) 7 Cox.C.C. (Eng.) 126.”
Here the particular offense that the appellant was convicted of was attempting to commit grand larceny under Section 817.021, Florida Statutes. The attempt to commit a crime involves the idea of an incompleted act as distinguished from the completed act necessary for the crime. In Gustine v. State, 86 Fla. 24, 97 So. 207, 208, the Supreme Court of Florida said:
“What acts will constitute an 'attempt’ to commit a crime is often difficult of determination. Of necessity, each case must be determined on its own facts. Generally, there must he an intent to commit a crime, coupled with an overt act apparently adapted to effect that intent, carried beyond mere preparation, but falling short of execution of the ultimate design. Bouvier’s Law Dict. (3d Rev.) vol. 1, title ‘Attempt’; 8 R.C.L. 276; 1 Wharton’s Crim.Law (11th Ed.) § 212; McClain’s Crim.Law, § 222; 3 Am. & Eng. Enc. of Law (2d Ed.) 250; Morton v. State, 72 Fla. 265, 73 South. 187; Hogan v. State, 50 Fla. 86, 39 South. 464, 7 Ann.Cas. 139; Graham v. People, 181 Ill. 477, 55 N.E. 179, 47 L.R.A. 731.” (Emphasis supplied)
In 35 C.J.S. False Pretenses § 36, p. 860 the necessary elements of an attempt to commit the crime of obtaining money by false pretenses which would be the same as attempted larceny by false pretenses in this state is thus summed up:
“An attempt to commit the crime of obtaining property by false pretenses is an offense, the elements of which are an intent to obtain by false pretense, the doing of an overt act toward obtaining the property by means of the pretense, and the failure so to obtain it.
“An attempt to commit the crime of obtaining property by false pretenses, or a like crime, is an indictable offense. Such an attempt consists in an intent to obtain by the false pretense, or the like; the doing of some overt act toward obtaining the property by means of the false pretense, or the like; and the failure so to obtain the property. The act or acts which defendant has performed must be more than merely preparatory; they must reach far enough toward the accomplishment of the desired result to amount to the commencement of the consummation of the crime, and they must be adapted to secure that end. If accused has proceeded thus far, and has not consummated the crime, he is guilty of the attempt, even though it develops that for some reason unknown to him he could not have completed the crime, or although the reason for his failure is that the person intended to be defrauded is unable or unwilling to part with the property sought to be obtained.
“It is not necessary, in order to establish an intent, that the prosecutor should have been deceived, or should have relied on the false pretenses and have parted with his property; indeed, if property is actually obtained in consequence of the prosecutor’s reliance on the false pretenses, the offense, is complete and an indictment for an attempt will not lie.”
The following excerpts from the quoted testimony herein of Rosenthal show representations of existing material facts made by appellant to Rosenthal on April 25, 1961, in Rosenthal’s office at the Skyway Bowl:
“That the money had to be in Tallahassee the following day if we wanted to get a liquor license.”
*662 Rosenthal also testified appellant told him at Rosenthal’s office on April 26, 1961:
“He (referring to appellant) told me he had friends up there and was ordered to see Jules and Robert Hollander on the Q. T.
******
“He (referring to appellant) told me he had been ordered to pick the money up by people higher up.
******
“He (referring to appellant) said that he would call somebody up the line and they were going to open the office tomorrow morning at nine o’clock I believe and advise them everything would be all right and I could come in tomorrow morning and pay off not later than ten-thirty.”
Hollander testified appellant said a few minutes before the money was delivered to appellant by Rosenthal in appellant’s home that “there would be a man waiting for the money that would take it to Tallahassee for the furtherance of the cause”. Hollander also testified that appellant did not say who would get the money when it got to Tallahassee. Hollander further testified that appellant said the only way they could get a liquor license was by appellant getting it for them. Rosenthal testified that appellant said on April 25, 1961, that five thousand dollars would have to be paid to appellant in order to obtain the liquor license over and above the actual fee charged by the State.
Thomas E. Lee, Jr., the Beverage Director, testified that he had met appellant on one occasion and that appellant had nothing to do with the issuance of beverage licenses because he, as Beverage Director, had the sole discretion and the final decision as to issue these licenses.
The following is quoted from the testimony of Mr. Lee:
“Q Do you know this defendant, Dr. J. C. Benefield?
“A Yes, I have met Dr. Benefield.
“Q Does he have anything to do with your office, the issuance of a beverage license ?
“A No, sir, he has nothing to do with me issuing a beverage license.
“Q Would the payment of two, three or four thousand dollars to Dr. Benefield have any bearing on your office in the issuance of such a license?
“A Absolutely not. * * * ”
“Q If an applicant had made contributions to the Governor’s campaign fund' would that have any effect on your decision in issuing a license?
“A Sir, I would not even know that.. It would have no influence on my decision. I don’t know who the contributors are.. * * * »
“BY THE COURT
“Q You are the supreme court of the-, liquor department?
“A Yes, sir.
“Q Your decision is final only it is-statutory?
“A That is correct.
“Q Even the Governor of the State of' Florida can not override you ?
“A Only by removal.
“Q He can remove you from office?
“A Yes, at any time. I am subject to-his pleasure.
“Q But he does not have the right to grant a license, that is your job?
“A Yes, sir.”
In Wharton’s Criminal Law and Procedure (1957), Volume 2, Chapter 22, page-320, Section 589, it is said:
“The false representation must be as to a material fact or event, existing. *663 ■or past. A statement as to a future event or a promise to produce a future result is not a criminal representation ■unless there is implicit therein a statement of the defendant’s ability or capacity to achieve that result, or, ac•cording- to some courts, a statement of his present intention to achieve that result, and such implied statement is false.
“Nevertheless a misrepresentation as to an existing or past fact is nonetheless a false pretense because it is coupled with a promise or prediction as to the future.”
Cases cited to support the text are Finlay v. State, 152 Fla. 396, 12 So.2d 112, 145 A.L.R. 299; Scarlett v. State, 25 Fla. 717, 6 So. 767; Morris v. State, 54 Fla. 80, 45 .So. 456, 14 Ann.Cas. 285.
We quote from 35 C.J.S. False Pretenses, ■§ 52, page 911:
“The falsity of the pretense need not be proved by direct evidence, but may be established by circumstantial evidence; it is sufficient if the evidence ■establish such facts as tend legitimately to show its falsity; and since accused is usually in a position to know the truth or falsity of the representation, slight evidence of its falsity is sufficient for a conviction, in the absence of countervailing evidence of its truth.”
The representation of existing facts made by appellant, as quoted above, and the testimony of the Beverage Director that he alone had the sole discretion to issue beverage licenses and appellant had nothing to do with it, were sufficient for a jury to legally infer from the direct evidence, as well as from the circumstantial •evidence, that the appellant had made false representations of material existing facts with the intent to deceive Hollander and Rosenthal. The fact that these men were not taken in by these false representations makes no difference as to appellant’s guilt because it was not necessary for the state to prove that the victims were deceived in order to sustain a conviction of an attempt to commit grand larceny.
The jury was charged on circumstantial evidence and the following quotation from the opinion of Chief Justice Browne of the Supreme Court of Florida in Smith v. State, 74 Fla. 594, 77 So. 274, 276, aptly states:
“It is not necessary that the false representations be entirely by spoken or written words. Acts and conduct in connection with the same, or even acts and conduct alone under certain circumstances, may be as potent to establish false representations as when made by word of mouth.”
The intent of appellant to defraud Hollander and Rosenthal must be proven by the State even though Hollander and Rosenthal were not actually deceived by appellant. This intent to defraud may be inferred from false representations as stated in 22 Am.Jur., False Pretenses, Section 105:
“The intent to defraud must, of course, be established. There need not be distinct and independent evidence of a fraudulent intent. Such intent may be inferred from the false representations. It has even been said that where property is obtained by an alleged false pretense, the falsity of the representation, if established, will raise a presumption of an intent to defraud. The use of the word 'presumption’ in this connection, however, seems to be inaccurate. The intent is not a presumption of law, but is a fact to be found by the jury.”
We hold there is sufficient evidence here of false representations made by appellant with intent to deceive to support the jury’s verdict of guilty of the crime of attempted grand larceny.
*664 The other questions raised by appellant on this appeal must now be considered. The first question is did the Court err in refusing to quash the direct information filed in this cause. A bill of particulars was filed by the State under Section 811.021(5), Florida Statutes, F.S.A., which reads as follows:
“(5) It shall he sufficient for any indictment, information or warrant returned, filed or issued under this section to charge generally that the defendant at the time and in the county specified, did steal the personal property, thing in action, evidence of debt or contract or article of value out of which the prosecution arose, describing the same in general terms and alleging generally the ownership and value thereof. This section shall not be construed as intending to interfere with the power of the court to require the state to furnish the defendant with a bill of particulars in proper cases and on sufficient showing that cause exists for the same.”
Section 811.021, previously discussed in this opinion, is the basis for the charge of grand larceny by false pretenses as set forth in the information which charges the defendant with stealing certain money, and the quoted section above states that an information which makes such charges is sufficient. See Hughes v. State, Fla.App. 1958, 103 So.2d 207.
The next question raised by appellant is whether or not the Court erred in denying appellant’s application for removal of the cause to another county under the provisions of Section 911.03, Florida Statutes, F.S.A. The lower court ruled on appellant’s motion at the trial after the jury had been examined on their voir dire. We fail to see any error in such procedure where there has been no showing by appellant of an abuse of discretion by the trial judge or that a qualified jury was not selected to try this case.
The next two questions may be considered together. They raise the question of whether or not the appellant’s constitutional rights have been violated by the entry into his home by the police officers without a warrant for his arrest and without a search warrant. If the search was incident to a lawful arrest and was a reasonable search and seizure then there was no error in the ruling of the lower court.
If the officers here who made the arrest of appellant had reasonable grounds to believe that the defendant had committed a felony it was a lawful arrest, even though the information upon which they based their arrest was told to them by Hollander and Rosenthal by giving a prearranged signal as they were leaving appellant’s home.
In Cortes v. State, 135 Fla. 589, 185 So. 323, 327, the Supreme Court of Florida said:
“Police officers in this State, under Section 8323, Compiled General Laws of Florida 1927, have the authority to arrest any person without a warrant if they have reasonable grounds to believe and do believe that said person has committed a felony. This is merely a re-statement of the common law. 4 Am.Jur., Arrest, Sec. 48, p. 33.
“It seems the officers had reasonable grounds to believe that the defendant may have committed a felony. Although that belief is based on what someone may have told them, the Court is of the opinion that is sufficient.”
Here the evidence is clear and convincing that the police officers had reasonable grounds to believe that appellant may have committed a felony and under these circumstances the arrest of appellant without a warrant was valid. The evidence also discloses and the lower court found that the search and seizure of the money in appellant’s bedroom by the officers was properly incident to a lawful arrest and was a reasonable search and seizure. The *665 lower court was not in error in its denial of appellant’s motion to suppress the evidence and in its ruling that the search did not violate appellant’s constitutional rights.
The other questions raised by appellant on this appeal have been considered and the Court is of the opinion that no reversible error has been shown in this case and the judgment of the lower court be, and it is hereby affirmed.
SHANNON, C. J., and KANNER, J., concur.